IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RAJ CHRISTOPHER GUPTA,

    Plaintiff,                    No. CIV S-00-1095 GEB GGH P

  vs.

C.A. TERHUNE, et al.,

    Defendants.            FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff is proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. On December 8, 2004, the court recommended that plaintiff's August 18, 2003, summary judgment motion be denied as to his Eighth Amendment claim. The court also recommended that plaintiff's Equal Protection claim be dismissed for lack of jurisdiction, that defendants be granted summary judgment as to plaintiff's procedural due process claim, that plaintiff's supplemental state law claims be dismissed and that plaintiff's requests for injunctive and declaratory relief be denied as moot.

        On February 2, 2005, the district court declined to adopt these findings and recommendations in part. The district court remanded the matter for consideration of the issue of qualified immunity as to plaintiff's Eighth Amendment claim. The district court adopted the

1  findings and recommendation in all other respects.  On February 8, 2005, the court ordered
2  defendants to file further briefing addressing the qualified immunity issue.
3  　　　　　On March 10, 2005, defendants filed a summary judgment motion on qualified
4  immunity grounds.  On May 4, 2005, plaintiff filed an opposition.  After carefully considering
5  the record, the court recommends that defendants' motion be granted in part and denied in part.
6  II.  Discussion
7  　　　　　The summary judgment standards are set forth in the December 8, 2004, findings
8  and recommendations and will not be repeated here.
9  　　　　　This action is proceeding on the amended complaint filed August 30, 2000.  The
10 defendants are C.A. Terhune, R. Castro, D.L. Runnels, B. Farris, J.M. Briddle, E. Coe, S. Cook,
11 L. Scribner, T. Singletary and Z. Beagle.  It is undisputed that plaintiff was held on lockdown
12 status with the Southern Hispanic inmates for eighteen months while housed on Facility A at
13 High Desert State Prison (HDSP).  It is undisputed that during the lockdown plaintiff was denied
14 out-of-cell exercise.  It is also undisputed that while plaintiff is not a Southern Hispanic, he
15 voluntarily associates with the Southern Hispanics.
16 　　　　　Plaintiff contends that being denied out-of-cell exercise for this length of time
17 violated the Eighth Amendment.  Defendants argue that they are entitled to qualified immunity as
18 to this claim.
19 　　　　　The threshold inquiry in a qualified immunity analysis is whether a state official
20 violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001).  If he
21 officially violated a constitutional right, the court conducts the following two part inquiry to
22 determine if they are entitled to qualified immunity:  1) was the law governing the state official's
23 conduct clearly established; and 2) under that law could a reasonable state official have believed
24 his conduct was lawful?  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002).
25 　　　　　The court first considers whether defendants violated plaintiff's Eighth
26 Amendment rights.  An Eighth Amendment claim that a prison official has deprived an inmate of

humane conditions of confinement must meet two requirements, one objective and one subjective. Allen v. Sakai, 40 F.3d 1001 (9th Cir. 1994), as amended on denial of rehearing, 48 F.3d 1082, 1083 (9th Cir. 1994), citing Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1977 (1994). "Under the objective requirement, the prison official's acts or omissions must deprive an inmate of '" the minimal civilized measure's of life's necessities."'" Id., quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399-2400 (1981). "The subjective requirement, relating to the defendant's state of mind, requires deliberate indifference." Id., citing Farmer, 511 U.S. at 836, 114 S. Ct. at 1979.

The deprivation of outdoor exercise can constitute cruel and unusual punishment. Spain v Procunier, 600 F.2d 189 (9th Cir. 1979). "[S]ome form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates. Id., at 199. The long term deprivation of exercise is a denial of a basic need in violation of the Eighth Amendment. Allen v. Sakai, 48 F.3d 1082, 1088 (9th Cir. 1994).

In Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979), the Ninth Circuit found that regular outdoor exercise is necessary "unless inclement weather, unusual circumstances, or disciplinary needs made that impossible." 600 F.2d at 199.

In their summary judgment motion, defendants argue that security concerns made it impossible to provide plaintiff with outdoor exercise for eighteen months. In the December 8, 2004, findings and recommendations, the court discussed the facts regarding this issue at length. The court will set out those facts again to the extent they are undisputed and relevant.

On January 5, 1999, a major disturbance occurred between the Northern and Southern Hispanics at HDSP on Facility A. See Defendants' Feb. 23, 2004, statement of undisputed facts, Exhibit B, D-00001, D-00002. The disturbance involved sixteen Northern Hispanic inmate attacking three Southern Hispanic inmates. Id. On that date, Facility A was placed on lockdown. Id., D-0003.

/////

1          The lockdown on Facility A following the January 5, 1999, incident was apparently lifted at some point, although the court cannot locate this date in defendants' exhibits. On March 6, 1999, a riot occurred on Facility A between the Southern Hispanics and the white inmates. Id., D-00113. The riot consisted of two separate incidents, which appeared to have been preplanned by the Southern Hispanic inmates. Id. On March 15, 1999, all inmates on Facility A but for the Southern Hispanic inmates had been returned to full programming. Id.

          The lockdown imposed on the Southern Hispanics in March 1999 was apparently lifted at some point because on May 9, 1999, a riot occurred on Facility A between Southern Hispanic inmates and White inmates. Id., D-00111. This attack was preplanned by the White inmates, most likely in retaliation for the March 6, 1999, incident. Id. Facility A was placed on lockdown status following this incident. Id.

          On May 25, 1999, a controlled yard release was initiated with groups of five Southern Hispanic and White inmates on Facility A being released for yard program only. Id., D-00108. Fifteen minutes after having been released onto the yard, another riot occurred involving the Southern Hispanic inmates attacking the White inmates. Id. The White and Southern Hispanic inmates were placed on lockdown status. Id.

          On June 17, 1999, a riot occurred on Facility A between the Southern Hispanics and the Northern Hispanics. Id., D-00118. The incident resulted in the death of one Northern Hispanic inmate and numerous injuries. Id. The incident consisted of six Southern Hispanic inmates attacking approximately thirteen Northern Hispanic inmates on the exercise yard. Id.

          On October 7, 1999, defendant Briddle proposed a plan to modify the lockdown status on Facility A. Id., D-00128. Defendant proposed cell and unclothed body searches of all White, Southern and Northern Hispanic inmates from October 11, 1999, through October 17, 1999. Id. Random searches would continue through October 18, 1999. Id. All White, Southern and Northern Hispanic inmates would then be interviewed regarding their knowledge of the issues that resulted in the lockdown. Id., D-00129. Defendant Briddle also requested a

4

1  controlled dialogue between the three ethnic groups to promote integration in programming.  Id.
2  There is no evidence that defendant Briddle's proposal was ever implemented.

3  On November 9, 1999, defendant Briddle issued another memorandum entitled
4  "Facility A Lockdown Status Update."  Id., D-00118.  In this memorandum, defendant Briddle
5  stated that during the week of November 1, 1999, through November 7, 1999, all Southern
6  Hispanic, Northern Hispanic and White inmates on Facility A were interviewed.  Id.  Defendant
7  Briddle stated that during the interviews, various ethnic inmates expressed their opinions that if
8  the Southerners came off lockdown status, the re-integration of Facility A would last for one day
9  to possibly one week before an incident occurred between the Northern and Southern Hispanics.
10  Id.  Defendant Briddle requested that the searches proposed in his October 7, 1999, memorandum
11  be implemented.  Id., D-00119.  Following these searches, he would reinterview the inmates.  Id.

12  On November 22, 1999, a riot occurred on Facility D that resulted in numerous
13  staff injuries.  Id., D-00092.  As a result of this riot, the entire prison was placed on a state of
14  emergency, which apparently derailed attempts to end the lockdown on Facility A.  Id.  On
15  January 6, 2000, the state of emergency was lifted.  Id., D-00018.  On January 10, 2000, a
16  modified program was initiated on Facility A, although the lockdown of Southern and Northern
17  Hispanics continued.  Id., D-00018.

18  On January 24, 2000, the Facility A staff was directed to prepare an unlock plan
19  for the Northern and Southern Hispanic inmates by the close of business on February 7, 2000.
20  Id., D-0016.  On August 29, 2000, an unlock plan was approved.  Id., D-0011.  The plan was
21  implemented in October 2000.  Id., D-00012.

22  Legitimate prison security needs would constitute an unusual circumstance
23  justifying the denial of outdoor exercise.  The record discussed above indicates that defendants
24  imposed and maintained the lockdown on Southern Hispanic inmates on Facility A for legitimate
25  safety and security concerns until January 2000, at which time Facility A staff were directed to
26  prepare an unlock plan.  Up until this time, several riots occurred as well as a murder.

5

In his August 13, 2003, summary judgment motion, plaintiff argued that defendants did not have legitimate security needs to justify the denial of outdoor exercise. Plaintiff referred to defendant Briddle's October 28, 1999, response to his administrative appeal regarding the lockdown in which he stated, "You explained that the Southern Inmates on Facility A have not received Rules Violation Reports. You are correct; however, the Southern Inmates are not on lockdown for disciplinary matters. The lockdown is related to institutional safety and security." Defendant Briddle's response to plaintiff's appeal supports defendants' position that in 1999 the lockdown and denial of exercise were due to legitimate institutional safety concerns.

In his summary judgment motion, plaintiff also argued that the only reason he was not provided with outdoor exercise during the lockdown was due to a staffing shortage. In support of this argument, plaintiff refers to defendant Briddle's December 17, 1999, response to his administrative appeal. In his response, defendant Briddle stated that staff resources had been diverted from normal programming functions for security oriented tasks such as searching, and therefore were not available to provide canteen and yard supervision. Plaintiff's December 5, 2001, summary judgment motion, Exhibit A.

Assuming that staff was unavailable to supervise outdoor exercise because they had been diverted for security oriented tasks, "prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost. This is for the benefit of the prisoners as much as for the benefit of the officials." Hoptowit v. Ray, 682 F.2d 1237, 1259 (9th Cir. 1982). Even if plaintiff was denied outdoor exercise during part of the lockdown because staff had been diverted to security related tasks, the denial of exercise was still a result of legitimate security concerns.

For the reasons discussed above, the court finds that unusual circumstances justified plaintiff's denial of outdoor exercise until January 2000, at which time staff was ordered to prepare an unlock plan. Because the court finds no constitutional violation, the qualified immunity analysis ends as to this period of time.

1  As discussed above, on January 24, 2000, the Facility A staff was directed to
2  prepare an unlock plan for the Northern and Southern Hispanic inmates by the close of business
3  on February 7, 2000. Defendants' Feb. 23, 2004, statement of undisputed facts, Exhibit B, D-
4  0016. Approximately six and one-half months later on August 29, 2000, an unlock plan was
5  approved. The plan was implemented in October 2000. The record contains no evidence
6  regarding why it took so long for the unlock plan to be approved and implemented. While it is
7  not unreasonable to infer that security problems continued to exist at some level during this time,
8  defendants have presented no evidence regarding why the Southern Hispanic inmates could not
9  have been released for outdoor exercise. Without this information, the court cannot find that
10 unusual circumstances justified the denial of outdoor exercise during this time.[1]

11  For the reasons discussed above, the court finds that taken in the light most
12 favorable to the party asserting the injury, i.e. plaintiff, defendants violated plaintiff's Eighth
13 Amendment rights by continuing to deny him outdoor exercise after January 2000. Saucier, 533
14 U.S. at 201, 121 S. Ct. at 2156. Accordingly, the court continues the qualified immunity analysis
15 and considers whether the law governing defendants' conduct was clearly established and
16 whether a reasonable state official could have believed his conduct was lawful.

17  At the time of the lockdown the law was clearly established that prison officials
18 could not deny inmates outdoor exercise for long periods of time unless inclement weather,
19 unusual circumstances, or disciplinary needs made that impossible. The issue is whether a
20 reasonable prison official would have believed that the continued denial of outdoor exercise to
21 Southern Hispanic inmates after January 2000 was lawful.

22  Because Facility A staff was directed to prepare an unlock plan in January 2000, it
23 is reasonable to infer that the security problems were less serious than before. Martinez v.
24 Stanford, 323 F.3d 1178, 1183 (9th Cir. 2003) (in qualified immunity analysis, court must view

---

[1] The court made this point in the December 8, 2004, findings and recommendations.

the evidence in the light most favorable to the plaintiff). Without knowing the level of the continued security threat during this time, the court cannot determine whether a reasonable prison official would have believed that the continued denial of outdoor exercise was lawful. The court also cannot make this determination without knowing why the unlock plan was not adopted and implemented until over six months after it was due. Accordingly, defendants are not entitled to qualified immunity based on the denial of outdoor exercise during this time.

This is not a situation presented where the court has known, settled facts from which it could judge—even in the context of clearly established law of which the defendants should have known in the abstract—that the circumstances facing the defendants muddled the nature of what reasonable persons should have known about the law to the point where qualified immunity is appropriate. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, supra, 533 U.S. at 202, 121 S. Ct. at 2156. But, the problem here is that the "situation [they] confronted" is not known—it was in Saucier.[2] We do not know, and cannot speculate adverse to plaintiff, about the situation the defendants herein faced, if any, in waiting so long to lift the lockdown after January 24, 2000; defendants do not relate the context during this year 2000 period. That is precisely why summary judgment cannot be granted.

Finally, defendants Runnels, Farris, Briddle, Coe, Cook, Singletary, Beagle and Scribner argue that they are entitled to qualified immunity because they were not responsible for plaintiff's lockdown status. Defendants argue that plaintiff has not linked them to the alleged deprivations.

---

[2] In Saucier, it was apparently undisputed that the context of the alleged constitutional violation was the hurried taking of the plaintiff from the scene where then Vice President Al Gore was speaking. The defendants did not know the full extent of the threat that plaintiff posed to the Vice President as he had approached the separation point between the speakers and the public with some type of action which drew their attention. The "extra" force applied was also undisputed.

A failure to link argument is not appropriately raised in the context of qualified immunity. Evaluation of this issue does not involve consideration of whether defendants violated plaintiff's constitutional rights. As discussed above, Judge Burrell remanded this matter for consideration of the issue of qualified immunity only. Judge Burrell did not authorize defendants to raise any other issues that they may have failed to raise at an earlier time in these proceedings. Accordingly, the court will not consider this argument insofar as it is raised in defendants' motion.

Nevertheless, after considering the record, the court finds that summary judgment is appropriate as to several defendants because there is no evidence of their involvement in the alleged deprivation. The court will sua sponte recommend that these defendants be granted summary judgment because plaintiff has had a "full and fair opportunity to ventilate the issues involved." Cool Fuel, Inc. v. Connett, 685 F.2d 309, 312 (9th Cir. 1982).

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed

9

constitutional violation must be specifically alleged. See <u>Fayle v. Stapley</u>, 607 F.2d 858, 862 (9th Cir. 1979); <u>Mosher v. Saalfeld</u>, 589 F.2d 438, 441 (9th Cir. 1978), <u>cert</u>. <u>denied</u>, 442 U.S. 941 (1979). Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient. See <u>Ivey v. Board of Regents</u>, 673 F.2d 266, 268 (9th Cir. 1982).

Defendants contend that once a lockdown is imposed, permission of the Director of Corrections must be obtained if it continues beyond 72 hours. <u>See</u> Defendants' Statement of Undisputed Fact filed Feb. 23, 2004, no. 5. The Warden of the affected prison is responsible for deciding which nonessential services will be suspended. <u>Id.</u>, no. 6. Therefore, defendants contend, only defendants Warden Castro and Director Terhune were responsible for making decisions about the duration or conditions of the lockdown at HDSP.

Attached to defendants' Statement of Undisputed Facts filed February 23, 2004, as Exhibit D, p. 00011 is a memorandum dated August 29, 2000. This memorandum is addressed to defendant Castro and contains the proposed recommendation for ending the lockdown of the Southern Hispanics on Facility A. According to the memorandum, Facility A Lieutenants Harrison and Barnash drafted the recommendation. The memorandum indicates that three prison officials, including defendants Scribner and Runnels, then approved the plan before its submission to defendant Castro for his approval. The memorandum does not state the date on which Lieutenants Harrison and Barnash submitted the proposal to defendants Scribner and Runnels. Nor does the memorandum state the date on which defendants Scribner and Runnels submitted the proposal to defendant Castro for his approval. However, the August 29, 2000, date on the memorandum suggests that defendants Scribner, Runnels and Castro all approved the plan on that date.

The August 29, 2000, memorandum indicates that defendants Scribner and Runnels had authority to approve or disapprove the proposed plan to release the Southern Hispanic inmates from lockdown. Although these defendants may not have had the ultimate

authority to end the lockdown, they certainly played a role in the process. Accordingly, the court finds that these defendants are sufficiently linked to the alleged deprivation.

Moreover, it is unclear from the August 29, 2000, memorandum whether Lieutenants Harrison and Barnash met the February 7, 2000, deadline for preparing the lockdown removal plan. If this deadline was met, the record contains no explanation for the six and one-half month delay in the final approval of the plan by defendants Scribner and Runnels, assuming they approved it on August 29, 2000. If defendants Scribner and Runnels caused an unreasonable delay in the implementation of the plan, then they may be liable for plaintiff's injuries.

For the reasons discussed above, the court finds that defendants Scribner and Runnels are adequately linked to the alleged deprivation. The court does not sua sponte recommend that these defendants be granted summary judgment.

As suggested above, the remaining issues in this case revolve around the plan contained in the August 29, 2000, memorandum to remove the Southern Hispanic inmates from lockdown and the apparent delay in its implementation. As for the remaining defendants Farris, Briddle, Coe, Cook, Singletary and Beagle, the amended complaint contains no allegations that they were involved in the preparation of this plan or otherwise participated in the delay of its implementation. The evidence submitted by the parties also does not support such a claim against these defendants. For these reasons, the court finds that these defendants are not linked to the alleged deprivation and should be granted summary judgment.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendants' March 10, 2005, summary judgment motion be granted as to all defendants for plaintiff's claim that he was denied exercise from January 1999 to January 2000; defendants' summary judgment be denied as to plaintiff's claim that he was denied exercise following January 2000; defendants' summary judgment motion be denied as to the claim that plaintiff failed to link defendants to the alleged deprivation;

2. Defendants Farris, Briddle, Coe, Cook, Singletary and Beagle be granted summary judgment sua sponte for all purposes.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  7/6/05

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
gupta.sj2